**Application of Don G. HUTTON and Christopher L. Wilson.**

**Patent Appeal No. 7486.**

United States Court of Customs and Patent Appeals.

Feb. 24, 1966.

Richard K. Parsell, New York City, Solon B. Kemon, Washington, D. C., for appellants.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

WORLEY, Chief Judge.

The sole issue here is whether the Board of Appeals committed reversible error in sustaining the examiner's rejection of claims 1 and 2, copied from a patent to Ebneth [1] for purposes of interference, as not supported in appellants' application.[2]

The subject matter is reflected in claim 2, to which we have added emphasis to indicate the precise method step in issue:

2. In the preparation of a solidified cellular polyurethane [3] by a process which comprises mixing liquid components together in a mixing chamber and flowing the resulting mixture into a suitable shaping device while it is still liquid and before any substantial amount of chemical reaction between said components, *the method of predetermining the cell size and the number of cells per unit of area of solidified product which comprises flowing the said mixture while still liquid through an elongated conduit thereby retarding the flow thereof from said chamber and building up a back pressure, whereby said cell size of the product after solidification is larger and the number of cells per unit area smaller the greater ·the retardation of flow of liquid from said chamber.*

Claim 1 differs from claim 2 in reciting "elongated enclosed passageway" instead of "elongated conduit."

In general, both Ebneth and appellants disclose methods which may be used to

1. U.S. Patent No. 2,948,928, issued August 16, 1960, on an application filed December 17, 1956.

2. Serial No. 158,613, filed December 11, 1961, as a division of Serial No. 585,-298, filed May 16, 1956.

3. Polyurethane foams are commonly prepared by reacting polyethers or polyesters containing free hydroxyl. groups with polyisocyanates in the presence of a suitable aqueous catalyst solution. Carbon dioxide evolved during reaction forms the pores in the resulting solid polyurethane plastic.

predetermine cell or pore size as well as the number of cells per unit area in finished polyurethane foam. Ebneth discloses a cylindrical mixing chamber provided with an agitator and appropriate inlets through which the individual components of the reaction mixture may be continuously or intermittently introduced into the mixing zone under pressure. After passing through the mixing zone, the reaction mixture flows to an area below the agitator toward a discharge orifice at the bottom of the mixing chamber. Ebneth states:

It has been found that it is possible to predetermine the cell or pore size of the finished polyurethane foam plastic by passing the reaction mixture through a conduit and by controlling the time the reaction mixture of components spends in the conduit adjacent the discharge orifice of the mixing chamber. The period of dwell in the conduit may be predetermined by means of the cross-sectional dimensions of the conduit or by means of the length of the conduit extending from the discharge nozzle. * * *

It is preferred to provide the apparatus with a conduit having a means for easily adjusting the diameter without changing the conduit. For example, the conduit may be provided with a globular valve or other suitable valve for throttling the flow of liquid through the conduit. [Fig. 3] Likewise, the conduit may be made of a flexible material and may be provided with a suitable clamp for adjusting the diameter of the conduit to suitably restrict the flow of the reaction mixture therethrough. Any other suitable means for predetermining the internal diameter of the conduit including the use of a set of interchangeable conduits of various diameters [Fig. 1] or of a diaphragm or other partial blocking means may be utilized [Fig. 2], it being important only that the conduit diameter and length be controlled by following the rule that the smaller the cross-sectional dimension of the conduit or the longer the conduit, the smaller the number of pores per unit area and the larger the pore. The rule may also be stated thus: the longer the reaction mixture is retained in the conduit, the larger the pores and the smaller number thereof per unit area of foamed product. It is preferred to use a tubular extension or conduit having a means for varying the diameter.

* * * * * *

No definitely proven theory has been advanced to explain the exact function of the conduit or extension in improving the porosity of the hardened foam. It may be that confinement of the reaction mixture in an area in which the back pressure is predetermined and controlled results in the improved pore structure because of the presence of this back pressure during the early stages of the chemical reaction. * * *

Employing a generally similar apparatus, appellants feed the components of the reaction mixture separately to a cylindrical mixing head from individual metering pumps which are capable of delivering the reactants "at a non-fluctuating rate" and at pressures of 50–300 pounds per square inch. The mixing chamber is provided with a particular arrangement of paddles and baffle means designed to create turbulence and shear effects conducive to mixing of the reactants. After passing downward from the mixing zone, the mixture is delivered to a suitable mold by means of an outlet nozzle having a valve arranged therein. From appellants' drawings it appears the nozzle can be a length of relatively small diameter pipe threaded into the base plate of the mixing head, to which a valve is threaded. Another length of pipe is threaded into the opposite side of the valve. Appellants' specification further states:

* * * It has been found that the pore size [of the foamed product]

may be carefully controlled by regulating the rotational speed of [the] paddles * * *.

* * * * * *

* * * Thus, with the higher mixing speeds the average pores in the foam will be quite fine whereas with a decrease in such mixing speed, said pores become coarse and of increased average size.

Appellants specifically ascribe the following function to the outlet valve of their apparatus:

* * * Pressure is maintained within [the] head * * * by appropriate settings on [the metering] pumps * * * and suitable regulation of [the] outlet valve * * *.

* * * * * *

Optimum pressure conditions within [the] mixing head * * * are obtained by adjusting the outlet valve * * *. Normal pressures found in the head range between about 10 to 15 pounds per square inch.

The examiner recognized that Ebneth discloses at least three methods of "retarding the flow" of liquid reactants through the "elongated conduit" to control pore size and the number of pores in the solid polyurethane foams, namely: (1) changing the discharge pipe diameter by substituting larger or smaller pipe as shown in Fig. 1 of Ebneth; (2) using a calibrated diaphragm to enlarge or narrow the diameter of the conduit as shown in Fig. 2 of Ebneth; and (3) providing the conduit with a suitable throttling valve to restrict flow as the valve is closed, illustrated in Fig. 3 of Ebneth. In rejecting claims 1 and 2 as "not readable" upon appellants' disclosure, the examiner said:

* * * These claims both require the flowing of the liquid "through an elongated passageway [or conduit] thereby retarding the flow thereof from said chamber and building up a back pressure." * * When the above quoted portion of these claims are read in the light of the disclosure of Patent No. 2,948,-928, in which they originate, it is found that they are necessarily restricted to the species of Figure 1 of this patent which is the only figure wherein mere flow through a "conduit" or "passageway" produces the required function of "thereby retarding the flow thereof and building up a back pressure." In the species of Figures 2 and 3 the building up of the back pressure is accomplished by the use of valves or restrictions and not by mere flow through a passageway or conduit as required by these claims. Applicants have no disclosure which corresponds to the method of control shown in Figure 1 of the patent. * * *

The examiner was of the further view that:

Granting, for the sake of argument alone, that claims 1 and 2 are not limited to Figure 1 of the patent, but may be regarded as also reading on Figures 2 and 3 of said patent, it is still held that applicants lack sufficient disclosure to support these claims. * * * Thus presuming (but not admitting) that these claims only call for the controlling of the pore density by the mere regulation of the pressure in the mixing head, no clear teaching to this effect can be found in applicants' specification.

The board agreed, adding:

In our opinion, there is no necessity for interpreting the language pertaining to the flowing of the liquid through the elongated conduit or passageway, because the language is clear and unambiguous. The "thereby" clause follows the procedural step of flowing the liquid through the elongated conduit or passageway, plainly meaning that the recited step results in the specified effect. Even though other procedures, such as the use of a pressure control valve, might also produce the specified result, they would not satisfy the claim language call-

ing for flow through an elongated conduit or passageway as the causative procedure.

\*   \*   \*   \*   \*   \*

Appellants' disclosure is also lacking in a teaching of predetermining cell size and number by controlling the flow retardation and back pressure buildup. We realize that appellants disclose control of pore size and also the maintenance of pressure in the mixer. However, there is completely lacking any disclosure that variation in the pressure results in control of pore size. \* \* \* Appellants disclose one method of pore size control (paddle speed); the claims of the Ebneth et al. patent specify a different method of pore size control (flow retardation and back pressure buildup) not disclosed by appellants.

With respect to the scope of the claims, as noted above, the examiner and board shared the view that the claims are necessarily restricted to the "Figure 1" embodiment of Ebneth, which relates to the use of interchangeable conduits of various uniform diameters, having no valve therein, to regulate liquid flow and back pressure. Since appellants disclose only an apparatus with a valve attached to the conduit, it is the position of the Patent Office that appellants' disclosure manifestly does not support the claim.

We cannot agree that such a restricted view of the broad, comprehensive language of either claim is proper. While it is true that flow of the liquid through "an elongated conduit" must result in the recited effects of "retarding the flow" and "building up a back pressure," we think it clear that the claims do not exclude the presence of a valve or other constriction in that conduit to yield that result. The claims are not limited to an elongated conduit of *uniform* diameter. Nor is there anything in this record to justify limitation of the seemingly broad language to only one of Ebneth's disclosed embodiments. Finally, as can be seen from his disclosure, Ebneth prefers to provide his apparatus with a conduit having a means for easily adjusting the diameter *without* changing the conduit, such as a *valve*. We think the board's position as to the scope of the claims is without support in the record and are satisfied that appellants do disclose flowing liquid through an elongated conduit or passageway, the sole process step of consequence recited in the claims.

We now turn to whether the functional results derived from flowing the liquid reaction mixture through the conduit are satisfied by appellants' disclosure. The examiner and board concerned themselves primarily with the fact that appellants make no express disclosure that flowing the liquid through a discharge nozzle with a valve therein results in "retarding the flow thereof" from the mixing chamber and "building up a back pressure" whereby cell size is larger and number of cells per unit area is smaller the greater the retardation of flow. From our reading of the record and appellants' brief, we think it fair to say that appellants concede they have no explicit disclosure of those results other than predetermining the pressure in the mixing head by adjusting the outlet valve. They urge, however, that the examiner and board erred in failing to hold that the subject matter of the claims is inherent in their disclosure.

We agree with appellants. The disclosure is sufficient if the results flowing from the process are inherent in the process as taught by the specification and drawings. In re Spencer, 273 F.2d 181, 47 CCPA 751. Appellants have presented affidavits setting forth facts, not controverted by the Patent Office, from which the affiants conclude the functional results are inherent in the process carried out as disclosed in the specification. Nothing appears in the present record to cause us to question the sufficiency or ability of the facts presented in those sworn ex parte statements to support the conclusion of inherency. *On this record*, we can see no reason, nor has the Patent Office presented any, why flow through the elongated conduit structure of appellants will

not necessarily and inherently result in retarding the flow, building up back pressure and affecting the cell size and number in the claimed manner just as performance of the same process step in the similar apparatus of Ebneth retards the flow, builds up back pressure and predetermines cell size and number.

The decision is reversed.

Reversed.

RICH, Judge (concurring).

I fully agree with the result reached but with qualifications as to what might be drawn therefrom.

This case seems to me quite similar in principle to In re Walter, 292 F.2d 547, 48 CCPA 1094. We there found support for a claim copied for interference purposes on the theory of inherency even though, as the dissenting opinion there pointed out (the same being true here), "appellant's application contains no express disclosure of the limitation in the appealed claim," "the property claimed * * * was not recognized or disclosed," and "appellant did not appreciate the advantage" of the structure as recited in the copied claim, at least so far as his disclosure was concerned. In *Walter*, although "the public would not have been taught the desirability" of what the *patentee* taught, had he "not entered the field," as the dissent in *Walter* pointed out, we nevertheless believed the applicant *was entitled to contest priority* of claims reading on his apparatus, on the basis of inherent disclosure.

For precedents in addition to In re Spencer which establish the supposedly "solid law" on inherency followed in *Walter*, see the cases cited in the dissenting opinion therein. To what may be gleaned therefrom I wish to add that, in my view, a holding of a right to *copy* for the purpose of *contesting priority* does not preclude further consideration of the right to *make* upon further evidence, if any, not before us, which might be produced in inter partes proceedings. Neither is it a ruling, one way or the other, that the applicant has so complied with 35 U.S.C. § 112, first paragraph, as to be entitled to a *patent* containing the copied claims. For my part, I am passing only on the right to have an interference—and that preliminarily. That was my view in *Walter*, contrary to the apparent dissenting view that what was at issue was whether the applicant could be "granted a claim."